Good morning, Your Honors. May it please the Court, I'm Aaron DeYoung. I'm joined at counsel's table by David Zecker for John McGuinness and Diane Eller, who are both present today from Clay County, and a group of other Tuscogee Valley landowners and Chunky Gallop Trail Recreations. I would like to reserve five minutes of my time for rebuttal, please. The Tuscogee Valley is a truly special place. It's one of the most peaceful, remote, rural communities I've ever seen. Picture yourself in a broad mountain valley with farms and homesteads spread far out from each other. The only anthropogenic noise you might hear is the occasional passing car or a distant tractor. And on the mountainsides above, the forested slopes of the Nantahala National Forest, the Chunky Gallop Trail, the area's most premier horseback riding destination, and Clay County's only access point to the internationally acclaimed Appalachian Trail. This is the environment that enchanted my in the Tuscogee Valley. And I'd like to focus today on two ways that the Forest Service completely overlooked the uniquely startling impacts of gunfire noise on this tranquil environment. How it impacted the psychological state of residents and the social fabric of the community in terms of the recreation potential in the Chunky Gallop Trail, as well as the environmental impact of gunfire. For a moment, I'd like to ask you to imagine that you're hosting a family reunion in the southern Appalachians, and you'd like to show off the best of what these mountains have to offer to your family from the comfort of a horseback ride. You've heard the Chunky Gallop Trail is the best place around to do it, and your plan is to ride up the Chunky Gallop to the Appalachian Trail, where your family will enjoy a nice picnic at the trail junction and head back the way you came. You're very pleased with the selection you've made of a destination as you ride up the mountainside in the morning sunlight, listening to the birds singing overhead, when suddenly, a loud burst of gunfire erupts from off to your left without warning, giving everyone a start, including the horses, who take off running without warning. And of course, it's the youngest, your 11-year-old granddaughter, who's thrown from her horse in the scrum. Mr. John, let me ask you, I've looked through the record to figure out, when you talk about how many are hikers, how many are horseback riders, how many are birdwatchers? I don't think birdwatching would do real well with gunfire. So, how many people would actually count that? Your Honor, no one ever did a head count, so that's not in the record. We don't have any numbers before us, but what we do have in the record is ample documentation from narrative accounts by members of the public who submitted comments during this period of time, pointing out the significance of the Chunky Gout Trail itself, that is so significant as both a horseback riding destination, as well as, as you pointed out, birdwatching. People with botanical interests are going out to survey the plants and whatnot. So, John McGinnis, who's present, submitted comments, for example, at JA 464, 467, 812 through 13, pointing out that the Forest Service itself actually publishes a trail guide that highlights the Chunky Gout Trail as one of the most significant trails in the area for its recreation potential. So, that's for sale, people are paying money for it, the Forest Service put significant resources into producing that. So, we don't believe that it's at issue in this case, whether or not the Chunky Gout is significant. It goes through, the Forest Service, again, itself, called it a unique backcountry experience, and that's in the record as well. Is there evidence about what impact unexpected gunfire might have on horses and a horseback? No, Your Honor, it was never analyzed. In that, although it was raised again and again and again, one of our plaintiff appellants is Aurelia Stone, who's actually disabled, gets around in a motorized wheelchair, but she can ride on horseback. And her favorite place to ride, where she always goes, every time, is the Chunky Gout Trail. She actually lives in another county, but she drives in from adjacent Cherokee County to Clay County to ride her horse on the Chunky Gout Trail, because it's simply the best. So, her concern that she expressed in her comments was, look, I've got to load my horses up, I've got to unload my horses, I've got to get on my horses and ride my horses. It's dangerous. I mean, horses are big and they're strong and things can easily get out of hand if they get startled and overcome the capacity of their handlers. Of course, she's got her two of them. And that is the predominant safety concern here, in terms of gunfire noise impacts. And that's exactly why we're so concerned that the Forest Service never examined those impacts, which were repeatedly and voluminously pointed out to them by many different comments over the course of these many rounds of NEPA analysis that have been performed over these past 16 plus years now. Well, it took them about 11 years from start to finish, but 2001, 2002 seems to be where this project began. But as to gunfire noise, the record is replete with examples of both expert analysis as well as public comments. And there is a Royal Canadian Mounted Police gunfire range study that they used to design and cite their ranges, which says gunfire noise is unique. You should measure it with decibels. It's unique because it evokes a startle reflex. It has uniquely psychological impacts on human beings to hear gunfire relative to any other kind of noise. You have the Schomer model, where the Forest Service actually enlisted the help of these acousticians, these experts, to model the noise. And they said, yes, there will be clearly noticeable, quote, unquote, clearly noticeable, possibly bothersome noise impacts the Chunky Gout Trail users. That's J.A. How close does the trail come to the shooting range? It's about, I think, it's 1,000 feet above it, and I believe it is about a mile off as the crow flies. But please allow me to get you a specific site where it responded rebuttal about that specifically. There was also the Schomer model used decibels in the Ron describing the noise level near the trail as clearly noticeable, possibly bothersome. Was there any further explanation about that? There was a model that was provided that gave decibel projections about the noise that would reach both the trail as well as the residences in the area. It turned out to be an under predictive model because the actual sound tests that were done found greater impacts to both the trail and to residences in the area. However, they did say that the alternative B, modified alternative B, which is the preferred alternative chosen by the Forest Service, would have five decibels greater impact to the Chunky Gout Trail users than would alternative C, the Chestnut Branch site, which was investigated as well. So I think that covers it more or less about the Schomer model. You mentioned the problem with horses. What, if any, burden does someone like the woman you described who enjoys horseback riding would have to demonstrate based on these decibel levels in the record to show that there's a legitimate issue with respect to that problem? So I think that the RCMP studies indications about the unique impacts of gunfire noise, the Merkin Hill analysis from the expert acousticians at Merkin Hill who submitted comments responding to the environmental assessments noise analysis saying that these clearly noticeable, possibly bothersome gunfire noise impacts to the Chunky Gout Trail will certainly be significant impacts. That does suggest a significant impact is what those acousticians said. They also pointed out gunfire sound is unique and, you know, that decibels are the appropriate measurement for gunfire noise impacts. And even the Forest Service itself admits that their measurements don't capture the qualities of gunfire, the uniquely startling impacts of the impulsive noise of gunfire sound. Wasn't there a, one of the, I know they did several different methods to try to measure this noise. One of them was they had a citizen or some Forest Service individuals and service folks who described the sound of the trail being like shouting. Right. And I can sort of appreciate what that might be to the human, but did anyone try to determine what impact that would have on horseback riding? Because that may have a different response. Maybe not as serious, maybe more serious. I just don't know. Precisely, Your Honor. And this here again is another example of where the Forest Service simply did not look to see what the impacts would be. It was a very obvious impact of the project. And instead of digging in and saying, okay, it looks like we have some significant impacts here regarding north, potentially significant impacts here, and of course that's all that's required for an EIS to be prepared. As the Sierra Club v. Peterson Court pointed out in the D.C. Circuit in 1983, EIS must be prepared if any significant impacts might result from the proposed action. And instead of taking that route and saying, okay, well, these are potentially significant impacts, let's do an EIS, they turned around and said, well, you know. Maybe I may not have asked my question all that right. I'm going to ask Mr. Kerkel's question. Was the Forest Service obligated to respond to every single comment of concern? For example, the woman who was concerned about horseback riding. A simple statement like that in the record, were they then obligated to go out and run some experiments as to how a horse would react to this particular level of noise? I appreciate your question, and thank you for following up on that. I think I understand your question a little better. Comments in the record are sufficient to rise to the level of suggesting that there may be potentially significant impacts. Certainly the expert analysis that's been added to those public comments of concern by people who are personally affected by this bolsters the argument that there were potentially significant impacts that ought to have been examined, period, and ought to have been examined. Yes, Your Honor, there are certainly situations such as the La Flamme versus FERC case out of the Ninth Circuit in 1988, and the Foundation for Wild Sheep versus USDA out of the Ninth Circuit in 1982, which found highly controversial impacts, in other words, significant impacts requiring the publication of an environmental impact statement in projects where there were purely non-scientific aesthetic and recreational concerns, strictly aesthetic and recreational concerns, and as well as in the Wild Sheep case, only qualitative and anecdotal comments in the record from interested parties who said, wait a minute, your analysis is off, and there are going to be significant impacts here. The court found those rose to the level of significance, requiring and triggering a mandatory preparation of an environmental impact statement. The other issues, as this court has articulated in Audubon Society versus the Department of the Navy, are a couple of things. You have to take a thorough examination of the impacts, and you have to give forthright acknowledgment of the harms that you found in that analysis. And to put it in plain terms, you've got to look before you leap, and you've got to be honest with the public and with what you're contemplating to take. And the Forest Service fell down at both stages of the thorough investigation. They did not look at a variety of things. There are no examinations of drive times. The entire rationale for the project is that we're trying to put the shooting range closer to the population centers with Clay County. Well, Forest Service never measured how long it takes to drive to the closest gun range today. That's the no-action baseline that's required. And they never measured how long it takes to drive to the proposed action alternative. The impact on property value. Yes, exactly, Your Honor. That is one of the key problems in this case, and the agency dodged its analysis on property value impacts in the face of a record that had literally every source of information in the property value impacts to the entire Tuscaloosa Valley solely because of the existence of this gun range. You may be overselling that. We had a broker who came in and said there may be a problem. Are you saying that that's enough? No, that is just the tip of the iceberg, Your Honor. What else was there? The Forest Service consulted with its own expert, Dr. Ken Cordell at the Forest Sciences Laboratory, and said, well, is there any research out there? What do you think about this? He said, yes, there are certainly scholarly research studies, peer-reviewed studies that draw the link between noise, pollution, and property devaluation in the area. And he said, from my personal experience, it would, quote-unquote, be very much an impact because most of the property is in the home and being impacted by that. Thirdly, there was a scholarly review article from the Hamline Law Review Journal that Ken Cordell's comment at JA-420. At JA-254 and 256, there is a scholarly article that points out the impacts of gun fire ranges to surrounding property values. And numerous news articles, as well as all these worried landowners who said, yes, we're worried about how this is going to affect our investment. So the record was replete with evidence about this. Instead, the agency said they couldn't find scholarly research proving a direct and statistically significant link. This is a standard that exists nowhere in NEPA, and I see I've run out of time. I'd be happy to answer any more questions, but I would like to reserve. You've got some time for one. Thank you, Your Honor. May it please the Court. Amy Ray for the United States Forest Service. Your Honors, the District Court properly granted the United States motion for summary judgment because the Forest Service made a decision that NEPA requires. The standard of review here is broadly discretionary. In other words, deferential. As long as the Forest Service made a rational decision based on information that responded to, based on data that it was able to collect with respect to the environmental effects, as long as the decision was rational, its decision should be affirmed. And in this case, its decision was rational. The Forest Service examined, conducted three sound studies. First of all, I note that this was an 11-year process. They considered five different sites. We had agencies from the sheriff to the county commissioners to the school board, school superintendent, North Carolina Wildlife Federation, United States Fish and Wildlife Service. All of those were in support of a shooting range in Clay County, a public range, to diminish the danger posed by residents who were increasing in numbers in terms of concealed carry, using weapons, firing weapons in places that were not safe. Is there actually in the record the level of that problem? There is, Your Honor. The sheriff notes, for example, and I'll find a page reference for you. The sheriff talks about a 167% increase in concealed carry permits. The county commissioners talked about the need for a safe place to shoot. Many of the comments, I mean, the plaintiffs talk about the number of comments that talk about how concerned certain residents are with the impact of this. There were at least an equal number of comments about how much this county needs a safe place to shoot. There were reports that people were out in the forest shooting. In backyards. Basically, there was no safe place. Now, the plaintiffs fault the Forest Service for not, for example, conducting a study on the distance or at least not mentioning the distance between Hayesville and the nearest public shooting range, which was in Georgia. But that shooting range's director said, we don't want any more Clay County people. We're looking only accepting from residents in the two-county area in Georgia that was closest to the range. So it was reasonable. And that's all NEPA requires, is a reasonable decision-making process. It was reasonable for the Forest Service to examine the nearest public shooting ranges or how far it was from Hayesville to the proposed sites and not to a place that is not actually accessible, at least the gun range in that case said we're not really available to Clay County North Carolina residents. It seems like an unusual use to me to put part of our national forest for a gun range. Are you aware of any other national parks or forests where public gun ranges will be installed? Yes. It's not unusual as far as I understand it. Now, Judge Traxler, I don't have a study or a record of how many, but they do reference a Cherokee County site. I'm not positive that that's within the national forest, but the ranger Stoll in her decision notes that the Forest Service is well aware of the impact of shooting ranges and particularly noise impacts because it is common. And it is very consistent with the multiple-use, the Forest Service statutes, the regulations that govern Forest Services encourage multiple uses and it directs the agency to accommodate multiple recreational uses. So you accommodate those who need a safe place to shoot with those who want to ride on horseback. But in this case the agency conducted three different sound studies, one of which was decibel specific and very scientific and the other two which were folks who went out to the various locations and reported on the level of gunfire that they heard. They found seven locations, two on the Chunky Gal Trail, five residences. Only one of the residences, a single residence, heard gunfire which was simulated to be extraordinarily heavy use. Four pistols and four rifles firing at the same time. They don't really think that's ever going to happen. But that was the simulation for these sound studies. And the most that they said was at that one house it was about conversational level of noise. So it's difficult for me to say. On the trail it was more significant. But that trail, the sound study was that in one particular place it was as loud as shouting perhaps. And how close was it at? It was .7 miles and it's a thousand feet higher. It's at joint appendix page 421. The site is a thousand feet below the Chunky Gal Trail and about .7 miles from the trail. The district court said that economic considerations were not part of NEPA where in fact regulation 40 CFR 1508.8B identifies economic and one of the factors to be considered in the impact of a federal project on a NEPA. Was the district court correct? I think that the district court would be correct if that was the only impact was economic. I think what NEPA requires is to consider the economic impact of the environmental factors. Was noise, noise such as could come from a shooting range be an environmental factor? Absolutely. And so I'm not suggesting that the Forest Service should not under any circumstances or would not appropriately consider the economic impact. What I would say about it in this case is how can you have an economic impact when nobody can hear it? The nearest property owners can hardly hear the sound. So if they ignored it all together, that would be a problem? First of all, they didn't ignore it. What they said is... There seems to be some confusion in the regulations and or the case law that suggests that when we're dealing with environmental impact, it means just that, not these ancillary concerns relating to economics or otherwise. Well, and there is case law from this court that says that you don't consider, and it was the case that was cited by the district court that said you don't, if the only impact is economic and the plaintiffs are saying, hey, it's going to hurt me economically, you don't actually consider that. I would suggest that it's appropriate for the Forest Service to consider economic impact caused by the environmental effects if it's related to the environmental impact, not just the existence of a particular project. But in this case, we have property values. The argument is that there's evidence in the record. There's not. There's a single realtor who says a motor speedway, I would have to tell potential buyers about this gun range because I have other buyers near a motor speedway that their property values went down. That's speculation. Even the law review article that Mr. DeJong cites is simply speculative. It says there could be an impact. Well, there has to be an impact based on how close the residences are and whether the property owners are actually going to be impacted by the agency's action. And in this case, the nearest property owner was a mile and a half away. The nearest downrange property owner was I would suggest would affect property values. More importantly, it doesn't really matter what I think. What matters is that the agency had the authority to look at it and say, you know, we don't see any evidence or scientific basis to support a property value impact in this case, and therefore, we don't see that as a key issue. And that's the decision the agency made, was that it wasn't a key issue under the factors in this case. Was the agency required to consider the impact of a substantial use of the trail, the horseback riding issue? Certainly. And they did. Now, in terms of the horseback issue, I don't think that the agency was required to read one comment and decide, oh, we better go put a horseback up on Chunky Gow Trail and see how the horse reacts. I don't think that was required. I think that what is required from the agency is what it did, which is to assess what's the impact going to be on those who use the Chunky Gow Trail. I note, by the way, that the portion of trail that is affected, according to the agency's assessment, was 1.4 percent of the entire trail system in Clay County. That's right. You've got one point where the trail begins, another one ends, and there's no bypass. Whether it's a problem for one part, it affects the whole trail, does it not? Well, I don't – I agree with Your Honor. It depends on how portion – I'm not – I don't think there's evidence that you have to hike the entire or horseback the entire trail. So my point is that there's miles and miles of trails in Clay County. This affects a very small part. And the other part of the evidence is that as you move away, it starts to decrease immediately. But if your horse is riding and you startle, and you're using it for horseback riding, you go to the Appalachian Trail, you've got a problem. Well, you would if there were any evidence in the record to support that that was actually, you know, supportable that the Forest Service needed to – suggested that the Forest Service needs to actually assess this particular concern. But the only evidence in the record was anecdotal, which, as the plaintiff suggests, can be enough, but there's not enough in this case to say, okay, we need to put horses up on that trail and examine it when you're talking about a level of shouting and – for a very brief period of time. You know, the interesting thing, I mean, I – as I reviewed this record, I was actually really impressed that the Forest Service identified five different sites. They found a site that has a natural backstop and bowl. They're down there in a little bowl where if there's a good place for a shooting range, it would seem to be this one. And this was the site that everyone who looked at it, all of the different federal and state local agencies said, this site makes sense. Now, they also suggest that there wasn't adequate consideration of the no-action alternative. That alternative was considered repeatedly in the environmental assessment as well as in the decision notice the ranger stated we did consider the no-build alternative. But it is up to the Forest Service to decide that – to accommodate the safety concern in Clay County and in a remote area of North Carolina to find a safe place for folks to be able to train the sheriff's – some of the law enforcement said, we need a place to train our officers. This is what we need. And they had the discretion to determine that that need existed and that they could adequately meet that need and balance it against the environmental effects. This court has been quite clear that an agency's decision making it – deciding to engage in an action, take action, that has some negative impacts is perfectly fine. That it should be affirmed as long as the agency considered those impacts, and in this case it did consider the sound impact, the noise, the traffic, the dust, and did look into the possibility of doing a property value analysis and determined that there just wasn't any very legitimate scientific way to measure that. And I would suggest the record doesn't even support much of a property impact given the remote location, the remote of the houses compared to the shooting range. If your honors don't have further questions, please affirm the district court. Thank you. Thank you Ms. Ray. Mr. DeYoung. I may have pleased the court. I would like to follow up on one thing we never finished discussing on direct, which is this issue of the shooting range closer to the population centers of Clay County. It's notable that they never measured the drive times under the current circumstances, in other words the no action alternative analysis, and they never compared that nor measured the drive times to the proposed action site. There are estimates listed in the environmental assessment for how long it would take to drive to – What are those final assessments? What is the comparison? So it's incomplete, your honor, is my unsatisfying answer because they estimated drive times to all of the sites except for the existing closest gun range, which is the Chattoosh Gun Club, which the government just referenced on the other side of the county line over in Georgia. This is – Clay County borders Georgia. So Georgia's not too far away. So is there anything in the record how far that is? Yes, your honor. So there were measurements taken. Because the Forest Service for so many years went on without ever looking at the whole rationale for the project and whether or not this project would satisfy that rationale, John McGinnis and Linda Clampett independently measured the drive times from the intersection of 64 and 69, which is recognized as the center of Hayesville, which is John McGinnis and Linda Clampett's measurements lined up. They both said they started from the same spot and they used the established driving speeds, posted speed limits rather, I should say. And they found that there was a 25-minute drive to – I'm sorry, here we go. There was a 39-minute drive to Perry Creek, the proposed alternative. There was a 35-minute drive to the Panther Top Gun Range, which was actually built after this project was first proposed. And there was a 25-minute drive to the Chattoosh Gun Club over on the other side of the state line in Georgia. So with respect to that second option, though, Ms. Ray points out that this was a private gun club and they weren't taking any more for the agency not considering that as an alternative. Yes, Your Honor. In my opinion, the government mischaracterizes the position of the Chattoosh Gun Club with regards to Clay County residents. It is – so they rely on this 2010 letter from the President, I believe his name is Steve Jones, of the Chattoosh Gun Range, who said that in 2010 we are not seeking members from Clay County. Well, this is the exact same scenario. This is – nothing changed between 2005 when he wrote his first comment letter about this project in 2010. They were never seeking members, but as of 2005, he said they had over 30 members from Clay County. And he listed – and then by 2010, he said, well, we kept growing. And what he said specifically was, well, it would be nice to have another option around to take some of the pressure off of the Chattoosh Gun Club. That's what he said. He said it would be nice. And he said they were not seeking members, which they never were, but they had many. And he listed a long list of accommodations that are available to Clay County residents to come. It's easy to join. If you want to be an actual full-fledged member, it's $60 the first year and $35 a year for following years. Anyone can use facilities without payment if they're accompanied by a member. And they can even show up unannounced. And it's so well-staffed and professionally run that there's always somebody who would be happy to accompany you to do a little shooting, as he called it, for free. And there are periodic onsite firearm safety instruction for the public. It's open to scheduled use up to one day a weekend. One day a weekend. That's it, right? Let's see. Yes, that is what I got. That's scheduled use for the public. How does that make that a practical alternative for the public? Well, as I've described, Judge Diaz, we see a very open-door policy at the Chachouj Gun Range, which is show up, come as you are, find somebody to shoot with. And you can shoot free. You don't even need to be a member. Or come down with a member and shoot with them all you want, as long as you're with somebody who's a member, that's fine. Or just join and become a member. And literally there are no barriers to this. This is the closest gun range. And what the government... What's the next closest one? The next closest gun range is Panther Top, Your Honor. How far is that? Thirty-five or thirty-four minutes, depending on whose measurement you believe. Lennon-Klampitz or John McGinnis. It's a pretty high indicia of reliability of those measurements. How far is the Haynesville to the proposed project? Thirty-nine minutes, Your Honor, adding 14 minutes to the existing drive time. And I see that I have run out of time speaking of time. So thank you, Your Honor. Thank you, Mr. Dionne. We'll come down to great counsel and then take a five-minute break.
judges: William B. Traxler, Jr., Albert Diaz, Richard Mark Gergel